THE QUEENSMORE.

THE QUEENSMORE v. MYERS et al.

(District Court, D. Maryland, July 6, 1892.)

1. SHIPPING—BILL OF LADING—PRELIMINARY CONTRACT—LIVE STOCK.
   On a voyage from Baltimore to Liverpool fire broke out in the cotton cargo of the steamship Queensmore, and in consequence respondents' cattle were suffocated or thrown overboard. Afterwards the ship became unmanageable, and, striking on a rock on the coast of Ireland, was lost. The freight by the bill of lading was expressed to be paid by the shipper, "ship lost or not lost." By the preliminary live stock freight contract, it was expressed to be paid on the number of animals shipped, whether delivered alive or not delivered at all, payable in Liverpool on the arrival of the ship. Held, that the bill of lading was the final agreement of the parties, and by it the freight was payable, notwithstanding the loss of the ship and her nonarrival at Liverpool.

2. SAME—CONSTRUCTION OF FREIGHT CONTRACT.
   Held, that the meaning of the live stock freight contract was merely to waive prepayment of the freight at Baltimore, and not to make the freight depend on the contingency of the ship's arrival at Liverpool.

(Syllabus by the Court.)

In Admiralty. Libel to recover freight. Decree for libelants.

Brown & Brune, for libelants.

Thomas W. Hall, for respondents.

MORRIS, District Judge. This is a libel on behalf of the owners of the British steamship Queensmore to recover freight at the rate of 80 shillings a head on 517 head of cattle shipped at Baltimore by the respondents, to be carried to Liverpool. The steamship sailed from Baltimore October 27, 1889, with the cattle on board, and with a general cargo, consisting in a great part of compressed cotton. During the voyage, without fault on the part of the owners of the steamship or those in charge of her, fire broke out in the cotton; and, notwithstanding heroic efforts on the part of the master, officers, and crew of the steamship to extinguish the fire and save the cattle, the fire continued and increased for five days, during which nearly all the cattle were suffocated or necessarily thrown overboard, only eight or ten in the extreme bow remaining. On the fifth day after the fire was discovered the ship became unmanageable, and in a dense fog struck a rock on the southwest coast of Ireland, and became a total wreck. The master, officers, and men suffered severely, and barely escaped with their lives. The libelants claim the freight on the cattle under the terms of the bill of lading given for them by which the freight is made payable, "ship lost or not lost."

The respondents contend that by the live stock freight contract the freight was payable only in the event of the ship reaching Liverpool, and that the live stock freight contract, and not the bill of lading, expresses the agreement between the shippers and shipowners as to the payment of the freight.

The live stock freight contract is quite similar to those mentioned in *The Enrique*, 7 Fed. Rep. 490; *The Oranmore*, 24 Fed. Rep. 922; and *The Caledonia*, 43 Fed. Rep. 681. It is dated July 12, 1889, and by it the respondents agreed to ship by the steamers of the Johnson line, sailing from Baltimore to Liverpool, between the 1st and 31st of October, 1889. two thirds as many cattle as the steamers could carry on their two upper decks. The provisions material to this controversy are as follows:

"(6) * * * And also free from all responsibility for mortality or accident of any kind to said cattle, or any of them; and if any of them die, or are thrown overboard, or are washed overboard, or are lost in any manner whatsoever, the freight is nevertheless to be paid, and is hereby guarantied to be paid, by the shippers."

"(13) The freight is payable upon said cattle at the rate of eighty shillings British sterling per head on the number shipped at Baltimore, whether delivered alive or not delivered at all, *and is payable in Liverpool on the arrival of the steamships.*"

When this shipment of cattle was put aboard the Queensmore, two bills of lading were given and accepted, the material parts of which are as follows:

"Shipped alive by Myers & Houseman, under and subject to the conditions, stipulations, and provisions set forth in a contract in writing between Myers & Houseman, and Patterson, Ramsay & Co., dated the 12th day of July, 1889, for the shipment of the cattle hereinafter mentioned, which is hereby made a part hereof, * * * 517 head of cattle, and the said animals, subject to the stipulations and exceptions hereinafter and before mentioned, are to be delivered from steamer's deck, where the steamer's responsibility shall cease, at the aforesaid port of Liverpool or at Birkenhead, unto order, or to his or their assigns. Freight payable by consignee at the rate of eighty shillings per head. * * * Freight is payable, *ship lost or not lost,* upon the number of animals embarked, without regard to and irrespective of the number landed; and the shipper hereby guaranties payment of such freight, if not paid by consignees."

The terms of the bill of lading are express that the shipper guaranties the payment of the freight, "ship lost or not lost," upon the number of animals embarked; and, unless this language is controlled by an inconsistent agreement in the live stock freight contract, the right of the libelants to recover the freight is clear. It has been held in *The Enrique*, 7 Fed. Rep. 490, and in *The Caledonia*, 43 Fed. Rep. 681, that the live stock freight contract is the preliminary agreement which the nature of the cattle shipping business requires the parties shall enter into before the cattle are collected and brought to the port of shipment; but that it is not intended to be the final agreement under which the sea carriage is actually undertaken, and which is usually to be found in the bill of lading. The preliminary agreement is usually made with the general agents of the owners for space on certain steamships. The bill of lading

is a special contract with a particular steamship, binding the ship as well as her owners.

In cattle shipments the freight is customarily required to be paid in advance, and looking to the agreement in this live stock freight contract that the freight was to be payable on the number shipped in Baltimore, although all the cattle died or were in any manner lost on the voyage, the fixing of the time and place of payment at Liverpool, on the ship's arrival, may very properly be taken as intended, in effect, merely as a waiver of the prepayment in Baltimore. That it was intended merely as a postponement of the time of payment is consistent with all the other provisions of the contract, while to hold that it was intended to make the payment depend on the ship's arrival in Liverpool is to make the payment depend upon a contingency as meaningless as a mere wager, for as freight was stipulated to be paid on the number put on board, although no cattle arrived, the arrival of the ship, if the cattle were all lost on the voyage, in no way concerned the shipper.

This interpretation of the live stock freight contract is confirmed and made certain by the bill of lading, which, having only to deal with the transaction after the cattle were received on board, stipulates for payment by the consignees, and contains an express guaranty of payment of the freight by the shipper, "ship lost or not lost." For five or six years before this particular shipment these respondents had been shipping cattle by this same line of steamers under similar live stock freight contracts, and accepting bills of lading containing the same stipulation as to payment of freight. It is quite clear that the real intention and agreement of the parties was that the freight was payable if the cattle were received on board, and not lost through the fault of the ship, and that the arrival of the ship at Liverpool was never intended as a condition of payment. I hold, therefore, not only that the bills of lading are the final and controlling agreement of the parties, but that there is nothing necessarily inconsistent between the live stock freight contract and the bills of lading in respect to the payment of the freight.